# 13-2025-cv(L),
## 13-2199-cv(XAP)

# United States Court of Appeals
## for the
## Second Circuit

EMILIANO ERMINI,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

VIVIANA VITTORI,

*Defendant-Appellee-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICUS CURIAE* AUTISM SPEAKS
## IN SUPPORT OF VIVIANA VITTORI

GARY S. MAYERSON
TRACEY S. WALSH
MARIA C. MCGINLEY
MAYERSON & ASSOCIATES
*Attorneys for Amicus Curiae Autism Speaks*
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

BRIEF OF AUTISM SPEAKS AS AMICUS CURIAE
IN SUPPORT OF DEFENDANT-APPELLEE VIVIANA VITTORI ....................1

I.  INTEREST OF AMICUS CURIAE ..................................................................1

II.  SUMMARY OF ARGUMENT .........................................................................5

III.  ARGUMENT ..............................................................................................7

A. THE IMPORTANCE OF ABA BASED TEACHING AND INTERVENTION AS AN EVIDENCE-BASED AND SCIENTIFICALLY VALIDATED APPROACH FOR TEACHING CHILDREN ON THE AUTISM SPECTRUM ......................................7

i.  A BRIEF HISTORY OF APPLIED BEHAVIOR ANALYSIS ("ABA") ....7

B. THE DISTRICT COURT CORRECTLY HELD THAT PETITIONER'S RECKLESS PLAN TO REMOVE D.E. FROM HIS CURRENT ABA PROGRAM HERE IN THE U.S. POSED A GRAVE AND "INTOLERABLE" RISK .....................................15

i.  ALTHOUGH PETITIONER MAY BELIEVE THAT D.E. CAN BE "CURED" OF HIS AUTISM IN ITALY, THERE PRESENTLY IS NO "CURE" AND ITALY DOES NOT YET HAVE THE SCIENTIFICALLY-VALIDATED AUTISM INTERVENTION RESOURCES THAT D.E. NEEDS AND THAT ARE AVAILABLE IN THE UNITED STATES ....................... 15

C. REMOVING AND RECKLESSLY CUTTING OFF "SEVERELY" AFFECTED D.E. FROM HIS DEMONSTRABLY EFFECTIVE ABA PROGRAM HERE IN THE U.S. WOULD CAUSE D.E. SERIOUS PHYSICAL AND PSYCHOLOGICAL HARM ...18

IV.  CONCLUSION ...........................................................................................18

CERTIFICATE OF COMPLIANCE .....................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*C.B. ex rel W.B. v. N.Y.C. Dep't of Educ.*, 2005 U.S. Dist. LEXIS 15215
(E.D.N.Y. 2005) ..................................................................................13

*C.L. v. N.Y.C. Dep't of Educ.,* No. 12 Civ. 1676, 2013 U.S. Dist. LEXIS 3474
(S.D.N.Y. Jan. 2, 2013) ......................................................................13

*Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004) ......................13

*L.B. v. Nebo School Dist.,* 379 F. 3d 966 (10th Cir. 2004) ......................................13

*M.H. v. N.Y.C. Dep't of Educ.*, 712 F.Supp.2d 125 (S.D.N.Y. 2010), *aff'd* 685 F.3d
217 (2d Cir. 2012) ................................................................13, 14, 15

*P.K. ex rel. S.K.  v. N.Y.C. Dep't of Educ.*, Nos. 11-3525(L),
11-3633(XAP), 2013 U.S. App. LEXIS 10477 (2d Cir. 2013)
(Summary Order) ................................................................................13

*R.K. ex rel. R.K. v. N.Y.C. Dep't of Educ.,* No. 09-CV-4478
(KAM) (RLM), 2011 U.S. Dist. LEXIS 32248 (E.D.N.Y. Jan. 21, 2011),
*adopting report and recommendation* No. 09-CV-4478 (KAM) (RLM),
2011 U.S. Dist. LEXIS 32235 (E.D.N.Y. Mar. 28, 2011), *aff'd sub nom.*
*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012) ..............................13

T.H. v. Bd. Of Educ. Of Palatine Community Consol. Sch. Dist., 55 F. Supp. 2d
830 (N.D. III. 1999) ...................................................................... 13-14

*Mr. X  v. New York State Educ. Dep't.,* 975 F. Supp. 546
(S.D.N.Y. 1997) ...................................................................................14

### STATUTES AND REGULATIONS

20 U.S.C. § 1415 *et seq.* ...............................................................................1

34 C.F.R. § 300.7(c)(1)(i). ...........................................................................2

### SECONDARY SOURCES

American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th Ed.). Arlington, VA: American Psychiatric Publishing......................................................................................................2

Autism Speaks, *Autism Prevalence Rises to 1 in 88*, http://www.autismspeaks.org/science/science-news/autism-prevalence-rises-1-88..................................................................................................................16

Baer, D.M., Wolf, M.M. & Risely, R.R., *Some Current Dimensions of Applied Behavior Analysis*, Journal of Applied Behavior Analysis,1, 91-97 (1968) ........8

Eikeseth, Svein, Smith, Tristram, & Eldevik, Erik Jahr Sigmund, *Intensive Behavioral Treatment at School for 4- to 7-Year-Old Children with Autism* 26 Behavior Modification, 49-68 (2002) ..............................................................11

John J. McEachin, Tristram Smith & O. Ivar Lovaas, *Long-Term Outcome for Children With Autism Who Received Early Intensive Behavioral Treatment*, 4 American Journal on Mental Retardation, 359-372 (1993)................................11

John W. Jacobson, James A. Mulich, Gina Green, *Cost-Benefit Estimates for Early Intensive Behavioral Intervention for Young Children with Autism-General Model and Single State Case*, 13 Behavioral Interventions, 201-226 (1998) ........................................................................................................ 9-10

New York State Department of Health. *Clinical practice guideline: Report of the recommendations. Autism/Pervasive Developmental Disorders, Assessment and Intervention for Young Children (Age 0-3 Years)* 139, 1999. (last visited December 17, 2013) http://www.health.state.ny.us/community/infants_children/early_intervention/autism/index.htm ...........................................................................................10

O. Ivar Lovaas, *Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children*, 55(1) Journal of Consulting and Clinical Psychology 3-9, (1987) ..................................................................... 8-9

# SECONDARY SOURCES CONTINUED

S. Eldevick, R.P. Hastings, J.C. Hughes, E. Jahr, S. Eikeseth & S. Cross, *Using participant data to extend the evidence base for Intensive Behavioral Intervention for children with autism*, 115 American Journal on Intellectual and Developmental Disabilities, 381-405 (2010).......................................................11

S. Eldevick, R.P. Hastings, J.C. Hughes, E. Jahr, S. Eikeseth & S. Cross, *Meta-analysis of early intensive behavioral intervention for children with autism*, 38 Journal of Clinical Child & Adolescent Psychology, 439-450 (2009)..............11

S. Rogers & L. Vismara *Evidence-based comprehensive treatments for early autism*, 37 Journal of Clinical Child & Adolescent Psychology, 8-38 (2008) ...................................................................................................................11

Reichow B, Barton EE, Boyd BA, Hume K, *Early intensive behavioral intervention (EIBI) for young children with autism spectrum disorders (ASD)*, SourceChild Study Center, Yale University School of Medicine, New Haven, CT, USA, http://www.ncbi.nlm.nih.gov/pubmed/23076956 ............................12

United States Surgeon General. Mental health: A report of the Surgeon General. 1999. Retrieved December 17, 2013, from http://www.surgeongeneral.gov/library/mentalhealth/chapter3/sec6.html ........11

iv

## BRIEF OF AUTISM SPEAKS AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-APPELLEE[1] VIVIANA VITTORI

### I. INTEREST OF AMICUS CURIAE

Amicus curiae Autism Speaks,[2] founded in 2005 by Bob and Suzanne Wright,[3] is today the world's largest not-for-profit autism science and advocacy organization dedicated to autism research, education, and demonstrably effective treatment. Autism Speaks has chapters across the United States, Canada, and the United Kingdom.

Autism, a pervasive developmental disorder, is defined under the implementing regulations to the Individuals with Disabilities Education Act, 20 U.S.C. Sec. 1415 *et seq.* ("IDEA"):

> **Autism** means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements,

---

[1] Plaintiff (Emiliano Ermini) is referred to as "petitioner" in other filings. Defendant (Viviana Vittori) is referred to as "respondent" in other filings.

[2] No part of this brief was authored by counsel for any party. No person, including any party or its counsel, other than amicus curiae, its members, or its counsel made a monetary contribution to the preparation or submission of the brief. Defendant has consented to this filing. Although twice requested in writing to do so, plaintiff has not consented to this filing. Autism Speaks has, for years, filed amici briefs with the United States Supreme Court and with other federal courts. Never before, however, has a party failed to consent to Autism Speaks' amicus status.

[3] The Wrights are the grandparents of a child with autism. Bob Wright is the former vice chairman of General Electric and chief executive officer of NBC and NBC Universal.

> *resistance to environmental change or change in daily routines*, and unusual responses to sensory experiences.

34 C.F.R. § 300.7(c)(1)(i) (emphasis added).  D.E. easily meets the clinical criteria for autism set forth in the Fourth or the (recently released) Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association, more commonly known as the "DSM."[4] While autism is recognized in the DSM as a "spectrum" disorder involving a wide range of severity, the parties are in agreement that D.E., the child who is the subject of this appeal, is "severely" affected.

Autism Speaks, under the auspices of its Global Autism Public Health Initiative and its International Autism Epidemiology Network, has established partnerships in more than forty countries on five continents to foster international research, services and awareness. In this connection, Autism Speaks is able to provide partner countries with a wealth of information and training based on evidence-based and scientifically tested "best practices." While Autism Speaks enjoys partnerships with more than 40 countries on 5 continents, plaintiff's current country of residence (Italy) is not yet a partner participant.

---

[4] As the DSM-V notes, ". . . people with ASD [autism spectrum disorder] may be . . . highly sensitive to changes in their environment . . . ." American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th Ed.). Arlington, VA: American Psychiatric Publishing.  The DSM's definition of autism is thus in accord with the IDEA statute's (regulatory definition) recognition that many people with autism can be resistant to changes in the environment.

Since its inception, Autism Speaks has committed nearly $200 million dollars to research and developing innovative resources for families. Autism Speaks has helped to bring about much needed autism insurance reform to 36 states, including New York, and has developed a Legal Resource Center to further promote that reform. Tens of thousands of affected families also have benefitted from utilizing the on-line, informational "tool kits" that have been developed by Autism Speaks through its Family Services Committee.[5]

Most recently, Autism Speaks has established the "Brian and Patricia Kelly Postsecondary Scholarship Fund" to provide funding to a select number of eligible two and four-year colleges, vocational/technical schools and transition programs within the U.S. For most parents in the United States, "college" outcomes were largely unthinkable just 20 years ago. What we now know about scientifically validated and evidence-based interventions is what has made the difference.

Autism Speaks' special expertise allows it to elucidate the unique educational challenges that children with autism face, both in the United States and internationally, in their quest to find demonstrably effective and scientifically

---

[5] To date, Autism Speaks has developed free, on-line, informational "tool kits" to address early intervention treatment options, sleep disorders, the challenge of enduring haircuts and dental appointments, and the highly unique needs of individuals diagnosed with Asperger's Syndrome or what some refer to as "high functioning" autism. D.E., of course, is not "high functioning." D.E. is "severely" affected. In any event, Autism Speaks' toolkits, while intended as valuable sources of *information*, are not intended to represent, nor are they a substitute for, appropriate therapeutic intervention and teaching support.

3

validated interventions and programs. Autism Speaks also can speak to the impact that autism has on the family.

Some marriages will actually grow stronger when facing a challenge as daunting as autism. Autism Speaks knows, however, that other marriages will crumble. Or, perhaps even worse, a marriage may continue under a dysfunctional state of siege. Here, prominent in the record is the district court's finding that plaintiff verbally and physically abuses his family and that plaintiff's abuse, while apparently leaving no discernible marks or scarring that would be visible to the naked eye (SPA 7-8), extends even to D.E. and his "severe" autism.

Autism Speaks' interest in this appeal is <u>not</u> to offer advice as to how the parties might resuscitate their marriage or why it would be a good idea for plaintiff to stop assaulting and otherwise abusing his wife and children. Rather, Autism Speaks' principal interest is to address the significant, if not disastrous *regression* and risk of grave physical and psychological harm that would most certainly result to D.E. if he were removed from his demonstrably effective ABA-based program here in the United States and flown back to Italy – a country that presently *lacks* the level of ABA resources that D.E. needs and that are credited for D.E.'s meaningful and demonstrable progress. Indeed, the record is clear that the parties came to the United States with D.E. specifically because our nation had the teaching and intervention services and supports that Italy lacked.

4

## II. SUMMARY OF ARGUMENT

As the district court found, D.E. has been making excellent progress in his ABA program and D.E. needs the "rigorous" support and consistency of that program to continue. (SPA 15-16) The district court found, *inter alia*, that removing D.E. from his current ABA program and taking D.E. to a country lacking the ABA resources that are available here in the United States would pose a grave risk of regression for D.E. that would be "intolerable." (SPA 15-16, 27-29)

Autism Speaks is entirely in accord with the district court's findings and analysis. Because of the recognized difficulty that people with autism have with transitions and changes in the environment, it would be of concern even if D.E. was being moved from his existing ABA program into a different ABA program in the same community. For a change in D.E.'s program and environment as precipitous and monumental as the one sought by plaintiff (a change that would take D.E. away from the consistency of his demonstrably efficacious ABA program and behavioral support to an uncertain situation in Italy), especially where D.E. is so young and "severely" affected, this Court could expect to see very serious, and even dangerous behaviors such as feces smearing, property destruction, physical aggression, and/or self-injurious behaviors. For the sake of D.E., Autism Speaks does not want this Court to inadvertently make the very mistake that the district court so wisely avoided.

5

There is another, equally compelling practical consideration going to the physical and psychological abuse that the district court charitably refers to as "disciplinary" in nature. In order to be in a position to teach any child with autism, let alone a "severely" affected child, it is essential that the student learn to *trust* the teacher and that the teacher be regarded as consistent and reliable. As the district court recognized, it is essential to try to avoid the "triggers" for regression. (SPA 14-15) Once again, Autism Speaks is fully in accord with the district court.

Where, as here, there is a history of physical and verbal abuse by plaintiff, that abuse will be in direct "competition" with whatever teaching may be attempted. Indeed, spanking and other forms of physical punishment would only "teach" D.E. to *fear* adults and to expect an unpredictable environment. Physical punishment would likely cause D.E. to "unlearn" much of what he has learned while in the CABAS ABA program – an intervention that is predicated on reinforcing and rewarding D.E. for his *positive* behaviors, *not* punishing D.E. for engaging in behaviors stemming from D.E.'s autism that his father erroneously believes can or should be corrected by spanking or other corporal measures.

Autism Speaks certainly does not believe that plaintiff, D.E.'s father, is intentionally attempting to put D.E. into a regressive tailspin. However, if plaintiff were intending to cause harm, it would be difficult to develop a plan posing a greater risk for D.E. than the course of action proposed by D.E.'s father.

6

## III. ARGUMENT

A. THE IMPORTANCE OF ABA BASED TEACHING AND INTERVENTION AS AN EVIDENCE-BASED AND SCIENTIFICALLY VALIDATED APPROACH FOR TEACHING CHILDREN ON THE AUTISM SPECTRUM

### i. A BRIEF HISTORY OF APPLIED BEHAVIOR ANALYSIS ("ABA")

In the United States, behavior analysts first began working with young children with autism and related disorders in the 1960s. Since that time, a number of ABA-based variants have evolved for students with autism. The most common variants include "Lovaas" style ABA, based on the pioneering work of Dr. Ivar Lovaas at UCLA, "verbal behavior" ABA, based on the work of B.F. Skinner and CABAS ABA, based upon the work and research of Dr. R. Douglas Greer at Columbia University. All three of these ABA variants have and follow common components and protocols, are scientifically validated in peer review journals, and should be regarded by this Court as functional equivalents.[6]

Applied Behavior Analysis ("ABA"), the science of human behavior, has been recognized for years in the United States as a evidence-based and scientifically tested best practice that utilizes the contingent use of *positive* reinforcement and other principles and factors to increase positive behaviors,

---

[6] In any event, D.E.'s meaningful, if not excellent, progress in his CABAS-based ABA program is amply documented in the record. In addition to his ABA teaching and behavioral support, D.E. receives the regular support of a special education teacher, a one-to-one assistant in his classroom, and "related services" that include speech therapy and occupational therapy. Accordingly, D.E.'s ABA teaching and behavioral support may properly be regarded as the *core* of D.E.'s program.

reduce undesirable behaviors, and generalize learned skills across different environments.[7]   More than 40 years ago, Baer, Wolf & Risley developed a definition of the science of ABA that continues to be cited:

> "Applied Behavior Analysis is the process of systematically applying interventions based upon the principles of learning theory to improve significant behaviors to a meaningful degree, and to demonstrate that the interventions employed are responsible for the improvement in behavior."[8]

In 1987, the publication of Dr. Lovaas' seminal NIH-funded study concerning the demonstrable efficacy of intensive, one-to-one ABA teaching gave the world genuine hope that with appropriate intensive teaching and behavioral support, many children with autism could be taught to "learn to learn." After two to three years of intensive ABA teaching (approximately 40 hours a week of one-to-one ABA), a significant percentage (47%) of the students who were in Dr. Lovaas' 40 hour/week experimental group progressed to the point of beginning to succeed meaningfully in mainstream or other "inclusion" settings and be looked upon as functionally "indistinguishable" from their neurotypical peers.   O. Ivar Lovaas, *Behavioral Treatment and Normal Educational and Intellectual*

---

[7] The very earliest ABA efforts also used "aversives," but the use of aversives was *discontinued* approximately 25 years ago in favor of *positive* approaches.

[8] See Baer, D.M., Wolf, M.M. & Risley, T.R., *Some Current Dimensions of Applied Behavior Analysis*, Journal of Applied Behavior Analysis, 1, 91-97 (1968).

*Functioning in Young Autistic Children*, 55(1) Journal of Consulting and Clinical Psychology 3-9, (1987).[9]

By and large, the students in Dr. Lovaas' experimental group who did not progress to the point of being included in mainstream classrooms nevertheless made excellent gains towards independence and self-sufficiency. Considering that many children with autism were then being routinely shipped off to institutions or other residential placements, Dr. Lovaas' 1987 study was viewed as a monumental breakthrough, demonstrating that children with autism could genuinely "learn to learn" and that the birth of a child with autism did not necessarily mean an inevitable countdown to institutional care.

Just a decade after Dr. Lovaas' seminal study was published, a related study concluded that providing early and intensive Applied Behavior Analysis ("ABA") treatment would conserve public resources in the range between approximately $200,000 and $1,000,000 per child over the course of the child's lifetime. John W. Jacobson, James A. Mulick, Gina Green, *Cost-Benefit Estimates for Early*

---

[9] Approximately 47% of the experimental group experienced significant I.Q. gains, with many students having pre-treatment I.Q.'s in the range of cognitively impaired (formerly referred to in the field as "mentally retarded"), and post-treatment I.Q.'s measurable in the range of "normal" intelligence. While there are other valuable teaching interventions besides ABA (e.g. occupational therapy, speech therapy, physical therapy, etc.), no single autism intervention has outcome data as good as the outcomes reported in Dr. Lovaas' 1987 ABA study.

*Intensive Behavioral Intervention for Young Children with Autism-General Model and Single State Case*, 13 Behavioral Interventions, 201-226 (1998).

The very next year (1999), a blue ribbon panel of scientists hand-picked by the New York State Department of Health made treatment recommendations for New York's "early intervention" program. These NYSDOE scientists published a three-volume set of recommendations citing Dr. Lovaas' ABA study with approval, recommending that:

1. principles of Applied Behavior Analysis (ABA) and behavior intervention strategies be included as an element of <u>any</u> intervention program for young children with autism;

2. intensive behavioral programs include, at a <u>minimum</u>, approximately 20 hours per week of individualized behavioral intervention using ABA techniques (not including time spent by parents); and

3. effective interventions should be based on ABA techniques used between 18 and 40 hours per week of intensive behavioral intervention <u>by a therapist trained in this method</u>.[10]

Most significantly, the New York State Department of Health did not identify any core teaching approach for autism *other* than ABA. Nor has it done so in the almost 15 years since its recommendations were first published.

---

[10] New York State Department of Health. *Clinical practice guideline: Report of the recommendations. Autism/Pervasive Developmental Disorders, Assessment and Intervention for Young Children (Age 0-3 Years)* 139, 1999. Retrieved December 17, 2013, from http://www.health.state.ny.us/community/infants_children/early_intervention/autism/index.htm.

In 1999, the Office of the United States Surgeon General released its own Report recognizing ABA as a highly effective, evidence-based and scientifically validated form of therapy for individuals diagnosed with autism.[11]

Today, ABA is widely recognized as a highly effective and scientifically validated treatment for autism.[12]  As noted above, it has been endorsed by a number of state and federal agencies, including the U.S. Surgeon General[13] and the New York State Department of Health.  "Early intensive behavioral intervention (EIBI), a treatment based on the principles of applied behavior analysis delivered

---

[11] United States Surgeon General. Mental health: A report of the Surgeon General. 1999. Retrieved December 17, 2013, from http://www.surgeongeneral.gov/library/mentalhealth/chapter3/sec6.html

[12] S. Eldevik, R.P. Hastings, J.C. Hughes, E. Jahr, S. Eikeseth & S. Cross, *Using participant data to extend the evidence base for Intensive Behavioral Intervention for children with autism*, 115 American Journal on Intellectual and Developmental Disabilities, 381-405 (2010)(demonstrating that outcomes were far better for children who received ABA); S. Eldevik, R.P. Hastings, J.C. Hughes, E. Jahr, S. Eikeseth & S. Cross, *Meta-analysis of early intensive behavioral intervention for children with autism*, 38 Journal of Clinical Child & Adolescent Psychology, 439-450 (2009)(establishing that early intensive behavioral intervention should be the intervention of choice for children with autism); S. Rogers & L. Vismara *Evidence-based comprehensive treatments for early autism*, 37 Journal of Clinical Child & Adolescent Psychology, 8-38 (2008)(finding that Dr. Lovaas' early study and ABA is the only early intervention for children with autism that met criteria as a 'well-established' treatment); Eikeseth, Svein, Smith, Tristram, & Eldevik, Erik Jahr Sigmund, *Intensive Behavioral Treatment at School for 4- to 7-Year-Old Children with Autism*, 26 Behavior Modification, 49-68 (2002).

[13] The report from the Surgeon General acknowledged the efficacy of ABA and cited with approval the "well-designed" study carried out by Dr. Lovaas and his colleagues.  United States Surgeon General. Mental health: A report of the Surgeon General. 1999. Retrieved December 17, 2013, from http://www.surgeongeneral.gov/library/mentalhealth/chapter3/sec6.html.

for multiple years at an intensity of 20 to 40 hours per week, is one of the more well-established treatments for [Autism Spectrum Disorder]."  Reichow B, Barton EE, Boyd BA, Hume K, *Early Intensive Behavioral Intervention (EIBI) for Young Children With Autism Spectrum Disorders (ASD)*, Source Child Study Center, Yale University School of Medicine, New Haven, CT, USA, http://www.ncbi.nlm.nih.gov/pubmed/23076956 (last visited Dec. 17, 2013).

While autism teachers, researchers and clinicians are well acquainted with the constant threat of regression and how devastating regression can be even for a child who is not "severely" affected, there apparently are no scientific studies detailing what happens to a "severely" affected experimental group when that experimental group is cut off from a demonstrably efficacious ABA program. Autism Speaks submits that the reason why such scientific studies do not exist is because scientists are governed by rules of ethics, and it would be both cruel and unethical to precipitously or otherwise starve an experimental group of severely affected children of the very treatment program that they need.

ABA certainly is not the only approach to teaching children with autism, particularly insofar as a child might require additional services for speech therapy, occupational therapy, physical therapy, counseling, assistive technology or social skills training. Moreover, just as some people may be allergic to penicillin, ABA does not work for all children. However, when it comes to choosing a <u>core</u>

12

teaching methodology that is needed to make a highly distractible and "severely" affected student with autism available for learning, there presently is no other scientifically validated, evidence-based approach with the excellent outcome data that ABA has.  In D.E.'s case, the record shows that he is making good and meaningful progress in his CABAS based ABA program.

For many years now, federal courts throughout the United States have recognized ABA as an appropriate and effective methodology for children with autism.  *See, e.g.; M.H. v. N.Y.C. Dep't of Educ.*, 712 F.Supp.2d 125 (S.D.N.Y. 2010), *aff'd* 685 F.3d 217 (2d Cir. 2012); *C.L. v. N.Y.C. Dep't of Educ.,* No. 12 Civ. 1676, 2013 U.S. Dist. LEXIS 3474 (S.D.N.Y. Jan. 2, 2013); *C.B. ex rel W.B. v. N.Y.C. Dep't of Educ.*, 2005 U.S. Dist. LEXIS 15215 (E.D.N.Y. 2005) ; *Deal v. Hamilton City Bd. Of Educ.,* 392 F.3d 840 (6th Cir. 2004); *L.B. v. Nebo School Dist.,* 379 F. 3d 966 (10th Cir. 2004); *P.K. ex rel. S.K.  v. N.Y.C. Dep't of Educ.*, Nos. 11-3525(L), 11-3633(XAP), 2013 U.S. App. LEXIS 10477 (2d Cir. 2013) (Summary Order); *R.K. ex rel. R.K. v. N.Y.C. Dep't of Educ.,* No. 09-CV-4478 (KAM) (RLM), 2011 U.S. Dist. LEXIS 32248 (E.D.N.Y. Jan. 21, 2011), *adopting report and recommendation* No. 09-CV-4478 (KAM) (RLM), 2011 U.S. Dist. LEXIS 32235 (E.D.N.Y. Mar. 28, 2011), *aff'd sub nom. R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012);  *T.H. v. Bd. Of Educ.*

13

*Of Palatine Community Consol. Sch. Dist.,* 55 F. Supp. 2d 830 (N.D. Ill. 1999);

*Mr. X v. New York State Educ. Dep't.,* 975 F. Supp. 546 (S.D.N.Y. 1997).

In 2010, in the *M.H.* case, United States District Court Chief Judge Preska concluded that P.H., a student with autism, required intensive one-to-one ABA teaching. Chief Judge Preska properly deferred to the trial judge's (IHO's) finding that "a 1:1 discrete-trial ABA program was substantively appropriate for P.H." *M.H.*, 712 F. Supp.2d at 164. Accordingly, Chief Judge Preska affirmed the IHO's decision in P.H.'s favor.

On appeal, this Court noted the importance of choosing a demonstrably effective methodology and identified the core elements of ABA:

> "ABA uses careful behavioral observation and *positive reinforcement* or prompting to teach each step of a behavior. A child's behavior is *reinforced with a reward* [14] when he or she performs each of the steps correctly. Undesirable behaviors, or those that interfere with learning and social skills, are watched closely. The goal is to determine what happens to trigger a behavior, and what happens after that behavior that seems to reinforce the behavior. The idea is to remove these triggers and reinforcers from the child's environment. New reinforcers are then used to teach the child a different behavior in response to the same trigger."

*M.H.*, 685 F.3d 217, 226 n.5 (2d Cir. 2012) (citing *Factsheet for Autism Therapy: Applied Behavior Analysis*, HEALING THRESHOLDS (Nov. 5, 2009, last

---

[14] Unfortunately, D.E.'s father's *punitive* disciplinary approach to D.E. and his behavior is entirely at odds with the "positive" reinforcement protocols that are the *sine qua non* of any quality ABA teaching program.

updated Dec. 21, 2009), http://autism.healingthresholds.com/therapy/applied-behavior-analysis-aba) (footnotes and emphases omitted).

Ultimately, this Court affirmed Chief Judge Preska's ruling, explaining:

"We agree with the district court that the SRO's decision, which took only the DOE's evidence into account, does not warrant deference in [regard to methodology]. The IHO's discussion of the substantive adequacy of the IEP, while brief, clearly explained that the IHO concluded that the key failing of the IEP was its failure to account for Dr. Salsberg's report … that P.H. required intensive 1:1 [ABA] instruction."

*M.H.*, 685 F.3d 217, 252 (2d Cir. 2012) (emphasis added). Accordingly, this Court has itself recognized the demonstrable efficacy of ABA 1:1 teaching as a core and efficacious teaching tool for students with autism. Here, where the child at issue is "severely" affected, the continuation of D.E.'s demonstrably effective ABA program is all the more critical.

B. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFF'S RECKLESS PLAN TO REMOVE D.E. FROM HIS CURRENT ABA PROGRAM HERE IN THE U.S. POSED A GRAVE AND "INTOLERABLE" RISK

i. ALTHOUGH PLAINTIFF MAY BELIEVE THAT D.E. CAN BE "CURED" OF HIS AUTISM IN ITALY, THERE PRESENTLY IS NO "CURE" AND ITALY DOES NOT YET HAVE THE SCIENTIFICALLY-VALIDATED AUTISM INTERVENTION RESOURCES THAT D.E. NEEDS AND THAT ARE AVAILABLE IN THE UNITED STATES

As defined, *supra*, autism is a disability universally recognized as a pervasive developmental disorder that adversely impacts communication, behavior, learning, and socialization. According to the National Institutes of Health (NIH)

15

and the Center for Disease Control (CDC), at least 1 in 88 children born today will be diagnosed with autism (1 in 54 boys).[15]  The available research shows that an intensive ABA program can make all the difference in terms of recovering a great deal of the *functionality* initially lost to autism.  However, the NIH and CDC are in accord with Autism Speaks that there presently is no "cure" for autism.

While plaintiff readily concedes at page 8 of his main brief that "D.E. is affected by a severe form of autism," plaintiff boldly represents to this Court that Dr. Antonucci (an ostensible autism expert who testified about ABA only in the most simplistic and generic of terms) is "fully qualified to **cure** a real severe disease such as autism." (Pet. Br. at p. 15) Similarly, at page 19 of his main brief, plaintiff-appellant strongly suggests that there is a "medical cure" and that such "cure" is something that can be accomplished in Italy, ostensibly with the help of Dr. Antonucci.

One of Autism Speaks' most serious concerns is that vulnerable and desperate parents are all too susceptible and willing to go into debt and even bankruptcy trying out highly questionable treatments and interventions that, to date, have not yet been scientifically proven to be efficacious.  It is all too easy for parents to cling to false hope and be victimized when someone claims that they can "cure" autism.  Autism Speaks has seen these claims come and go and meanwhile,

---

[15] Autism Speaks, *Autism Prevalence Rises to 1 in 88*, http://www.autismspeaks.org/science/science-news/autism-prevalence-rises-1-88

critical intervention time is lost as parents waste their life savings pursuing a false hope to a dead end.

As a child ages, there is a corresponding decrease in brain plasticity. Parents – particularly the parents of a child diagnosed with "severe" autism, should not allow a child with autism to languish in an unproven and ineffective educational program where every passing moment means losing developmental opportunities that can never be regained. Autism is a 24/7 "workaholic" that does not know that it is the weekend or time to go on vacation. Autism, a pervasive developmental disorder, cannot be remediated without an equally aggressive and pervasive intervention program.

As discussed, *supra*, there is a large body of scientific evidence going back for more than 40 years to support the efficacy of ABA and other variants of intensive behavioral teaching. Accordingly, because the consequences of making the wrong programming and intervention choice can be catastrophic, the Autism Speaks website strongly encourages parents to focus their energies on implementing an intensive *behavioral* program (such as ABA) before looking at other interventions and options.

C. REMOVING AND RECKLESSLY CUTTING OFF "SEVERELY" AFFECTED D.E. FROM HIS DEMONSTRABLY EFFECTIVE ABA PROGRAM HERE IN THE U.S. WOULD CAUSE D.E. SERIOUS PHYSICAL AND PSYCHOLOGICAL HARM

Unfortunately, while Italy is beginning to make some strides in the right direction, the record reflects that Italy does not yet have nearly the scope, quality and deep "bench" of ABA resources that have evolved in the United States over the last 25 years. For that reason, at least at this time and critical juncture, removing D.E. from his *demonstrably* efficacious ABA program here in the United States and putting him on a plane to Italy, to receive an uncertain and undefined treatment program, would pose a grave risk of physical and psychological harm to D.E. Under plaintiff's proposed removal plan, D.E.'s regression would be all but guaranteed and, as noted above, that regression would likely be quite serious, if not irreparable.

## IV. CONCLUSION

Autism Speaks urges that it would pose a grave risk of regression and other harm, both psychological and physical, if D.E. were precipitously or otherwise removed and cut off from his demonstrably effective CABAS ABA program here in New York and put on a plane to find himself in a country that, at least at this point in time, does not have the scope and quality of ABA resources that are available in the United States and where, unfortunately, D.E. would have to risk further physical and psychological "punishment" by plaintiff, his father. Plaintiff's

18

"disciplinary" approach, while undoubtedly well intentioned, is a punitive approach that is entirely at odds with the "positive" reinforcement approach that is the very heart of D.E.'s ABA program. For all the foregoing reasons, Autism Speaks respectfully urges that this Court should affirm the District Court's Order.

Dated:  December 20, 2013
        New York, New York

Respectfully submitted,
*s/Gary S. Mayerson*
Gary S. Mayerson (GSM 8413)
Tracey S. Walsh (TW 2746)
Maria C. McGinley (MM 9438)
*Mayerson & Associates*
*Counsel for Amicus Curiae*
        *Autism Speaks*
330 West 38th Street, Suite 600
New York, New York 10018
(212)265-7200

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Gary S. Mayerson, Attorney of record for Autism Speaks and its Federal Legal Appeals Project, (proposed) *amicus curiae,* do hereby certify that the foregoing amicus brief complies with the type-volume limitation as set forth in the Federal Rules of Appellate Procedure 32(a)(7)(b). The total number of words in the foregoing brief is 4,564 words.

*/s/ Gary S. Mayerson*
Gary S. Mayerson (GSM 8413)
Mayerson & Associates
*Attorneys for Amicus Curiae*
330 West 38th Street, Suite 600
New York, NY 10018
(212) 265-7200

Dated: December 20, 2013
New York, New York